**LITE DEPALMA GREENBERG & AFANADOR, LLC**
Joseph J. DePalma
Catherine B. Derenze
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

*Attorney for Plaintiff and the Proposed Class*
[*Additional Attorneys on Signature Page*]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ERIC LARSON, individually and on behalf of all others similarly situated, | Civil Action No.: |
| *Plaintiff*, | |
| v. | **COMPLAINT – CLASS ACTION** |
| CONDUENT BUSINESS SERVICES, LLC and HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE CORPORATION d/b/a BLUE CROSS BLUE SHIELD OF MONTANA, | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

Plaintiff Eric Larson ("Plaintiff"), on behalf of himself, and all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against Conduent Business Services, LLC ("Conduent") and Health Care Service Corporation, a Mutual Legal Reserve Corporation d/b/a Blue Cross Blue Shield of Montana ("BCBSM", collectively "Defendants"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Plaintiff brings this class action lawsuit on behalf of himself and on behalf of all persons who entrusted Defendants with sensitive Personally Identifiable Information ("PII")[1] and Protected Health Information ("PHI") (collectively, "Private Information") that was impacted in a data breach (the "Data Breach" or the "Breach").

2. Plaintiff's claims arise from Defendants failure to properly secure and safeguard Private Information that was entrusted to them and their accompanying responsibility to store and transfer that information.

3. Defendant Conduent a provider of digital business solutions and services to clients across the commercial, government, transportation and healthcare sectors (the "Clients"), including Defendant BCBSM, and maintains its principal place of business in Florham Park, New Jersey.[2]

4. Defendant BCBSM is a Montana-based health insurer, providing a variety of health insurance plans and administrative services.

5. Defendants had numerous statutory, regulatory, contractual, and common law duties and obligations, including those based on affirmative representations to Plaintiff and Class Members, to keep their Private Information confidential, safe, secure, and protected from unauthorized disclosure or access.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

[2] *About Conduent*, Conduent Business Services, LLC: https://www.conduent.com/about-conduent/ (last visited Oct. 27, 2025).

6. On January 13, 2025, Defendant Conduent learned that it was the victim of a cyber incident.[3] In response, Defendant Conduent launched an investigation to determine the nature and scope of the Data Breach.[4]

7. Defendant Conduent's investigation determined that an unauthorized third-party had access to its IT Network from October 21, 2024, to January 13, 2025, and was able to exfiltrate files on Defendant Conduent's IT Network containing Private Information of clients of Defendant's Clients.[5]

8. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, date of birth, medical and health insurance information.

9. On or around October 24, 2025 – ten months after becoming aware of the Data Breach - Defendant Conduent issued a notice of public disclosure about the Data Breach.

10. Defendants failed to take precautions designed to keep individuals' Private Information secure.

11. Defendants owed Plaintiff and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Defendants solicited, collected, used, and derived a benefit from the Private Information, yet breached their duties by failing to implement or maintain adequate security practices.

12. The Private Information compromised in the Data Breach contained highly sensitive patient data, representing a gold mine for data thieves. The data included, but is not

---

[3] *Data Breach Notifications*, Conduent Business Services, LLC, Office of the Maine Attorney General https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3208 (last visited Oct. 27, 2025).
[4] *Id.*
[5] *Id.*

limited to, Social Security numbers and sensitive medical information that Defendants collected and maintained on behalf of patients and policyholders.

13. Armed with the Private Information accessed in the Data Breach (and a head start), data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, and giving false information to police during an arrest.

14. Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering, ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, the loss of the benefit of their bargain, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

15. Plaintiff brings this class action lawsuit to address Defendants inadequate safeguarding of Class Members' Private Information that they collected and maintained, and their failure to provide timely and adequate notice to affected patients and policyholders, including Plaintiff and Class Members, of the Data Breach and the types of information unlawfully accessed.

16. The potential for improper disclosure and theft of Plaintiff and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take necessary steps to secure the Private Information left it vulnerable to an attack.

17. Upon information and belief, Defendants failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information. Had Defendants properly monitored their IT Networks, and those belonging to third-party vendors, they would have discovered the Breach sooner.

18. Plaintiff and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

19. Plaintiff seeks to remedy these harms on behalf of himself, and all similarly situated individuals whose Private Information was accessed and/or compromised during the Data Breach.

20. Accordingly, Plaintiff, on behalf of himself and the Class, asserts claims for negligence, negligence *per se*, unjust enrichment, and breach of third-party beneficiary contract.

## PARTIES

***Plaintiff***

21. Plaintiff is a citizen and resident of Belgrade, Montana.

***Defendant***

22. Defendant Conduent is a New Jersey corporation maintaining its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey, 07932.

23. BCBSM is a division of Defendant Health Care Service Corporation. Defendant Health Care Service Corporation is an Illinois corporation with its principal place of business at 300 E. Randolph St. FL 4, Chicago, IL 60601.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of Class Members is more than 100 and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendants citizenship.[6] Thus, minimal diversity exists under 28 U.S.C. § 1332 (d)(2)(A). Defendant Conduent has its principal place of business located in this District.

25. This Court has personal jurisdiction over Defendants because Defendant Conduent is registered to do business and maintains its principal place of business in this District, and Defendants conduct substantial business in this District.

26. Venue is proper in this Court because Defendant Conduent's principal place of business is located in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendants

27. Defendant Conduent is a provider of digital business solutions and services to clients across the healthcare, commercial, government, and transportation sectors, including Defendant BCBSM.

28. Defendant BCBSM is a Montana-based health insurer, providing a variety of health insurance plans and administrative services.

---

[6] Adler, Steve, *Business Associate Data Breach Affects 462,000 Blue Cross Blue Shield of Montana Members* https://www.hipaajournal.com/blue-cross-blue-shield-montana-data-breach/ (last visited Oct. 27, 2025).

29. As a condition of doing business, Defendant Conduent requires that its Clients, including Defendant BCBSM, entrust it with highly sensitive personal information belonging to their clients. In the ordinary course of receiving service from Defendant Conduent's Clients, Plaintiff sand Class Members were required to provide their Private Information to Defendants.

30. Upon information and belief, Defendants made promises and representations to individuals that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

31. Plaintiff and Class Members provided their Private Information to Defendants, either directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

32. As a result of collecting and storing the Private Information of Plaintiff and Class Members for their own financial benefit, Defendants had a continuous duty to adopt and employ reasonable measures to protect Plaintiff and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach**

33. On January 13, 2025, Defendant Conduent discovered that it was the victim of a cyber incident.[7] In response, Defendant Conduent launched an investigation to determine the nature and scope of the Data Breach.[8]

34. Defendant Conduent's investigation determined that an unauthorized third-party had access to its IT Network from October 21, 2024, to January 13, 2025, and was able to exfiltrate

---

[7] *Data Breach Notifications*, Conduent Business Services, LLC, Office of the Maine Attorney General https://www.maine.gov/cgi-bin/agviewerad/ret?loc=3208 (last visited Oct. 27, 2025).
[8] *Id.*

files on Defendant Conduent's IT Network containing Private Information of clients belonging of Defendant Conduent's Clients.[9]

35. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, date of birth, medical and health insurance information.

36. On or around October 24, 2025 – ten months after becoming aware of the Data Breach - Defendant Conduent issued a notice of public disclosure about the Data Breach.

37. Defendants had obligations created by the FTC Act, HIPPA, contract, common law, and industry standards to keep Plaintiff and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

38. Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

39. The Data Breach resulted in unauthorized third-party accessing and acquiring files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff and Class Members' Private Information was accessed and stolen in the Data Breach.

40. Upon information and belief, Plaintiff's Private Information, and that of Class Members, was subsequently published on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

41. Defendants failed to take precautions designed to keep individuals' Private Information secure.

---

[9] *Id.*

42. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

### C. Defendants Acquire, Collect, and Store Plaintiff's and Class Members' Private Information

43. As a condition to obtain services from Defendants, Plaintiff and Class Members were required to give their sensitive and confidential Private Information to Defendants.

44. Defendants retain and store this information and derive a substantial economic benefit from the Private Information that they collect. But for the collection of Plaintiff's and Class Members' Private Information, Defendants would be unable to perform their services.

45. At all relevant times, Defendants knew they were storing sensitive Private Information and that, as a result, their systems, and those of their third-party vendors, would be an attractive target for cybercriminals.

46. Defendants also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

47. Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

48. Upon information and belief, Defendants made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

49. Defendants' negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**D. Defendants Knew or Should Have Known of the Risk of a Cyberattack Because Healthcare Entities in Possession of Private Information Are Particularly Suspectable.**

50. Data thieves regularly target entities in the healthcare industry like Defendants due to the highly sensitive information that they maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

51. Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting entities in possession of PHI like Defendants that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

52. In light of recent high profile data breaches at other industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

53. In 2024, a 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[10]

---

[10] 2024 Data Breach Annual Report, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter. org/publication/2024-data-breach-report/ (last visited Oct. 25, 2025).

54. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[11]

55. Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[12] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[13] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole. [14]

56. Indeed, cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendants have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

[11] *Id.*
[12] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last visited Oct. 25, 2025).
[13] *See* Elinor Mills, Study: Medical identity theft is costly for victims, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Oct. 25, 2025).
[14] *See id.*
[15] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Oct. 25, 2025).

57. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

58. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants server(s), and those of their third-party vendors, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

59. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

60. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

61. As entities in possession of patients and policyholders Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems, or those belonging to third-party vendors, were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

**E. Defendants Fail to Comply with FTC Guidelines**

62. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

63. In 2016, the FTC updated its publication, *Protecting Personal Information*: *A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[16]

64. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[17]

65. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

66. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15

---

[16] Protecting Personal Information: A Guide for Business, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 25, 2025).
[17] *Id.*

U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

67. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect individuals' data, like Defendants. *See, e.g.*, *In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

68. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

69. Defendants failed to properly implement basic data security practices.

70. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to patients and policyholders Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71. Upon information and belief, Defendants were at all times fully aware of their obligation to protect the Private Information of Plaintiff and Class Members. Defendants were also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**F. Defendants Fail to Comply with HIPAA Guidelines**

72. Defendants are covered businesses under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

73. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[18] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

74. HIPAA's *Privacy Rule or Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

75. HIPAA's *Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

76. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

77. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

78. HIPAA's Security Rule requires Defendants to do the following:

---

[18] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

79. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants re required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

80. HIPAA and HITECH also obligate Defendants to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

81. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

82. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies

and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

83. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[19] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[20]

### G. Defendants Fail to Comply with Industry Standards

84. As noted above, experts studying cyber security routinely identify entities in possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

85. Several best practices have been identified that a minimum should be implemented by employers in possession of PII and PHI, like Defendants, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus,

[19] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Oct. 25, 2025).
[20] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Oct. 25, 2025).

and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendants failed to follow these industry best practices, including a failure to implement multi-factor authentication.

86. Other best cybersecurity practices that are standard for employers include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendants failed to follow these cybersecurity best practices, including failure to train staff.

87. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).

88. These foregoing frameworks are existing and applicable industry standards for a business and healthcare provider's obligations to provide adequate data security for its patients' sensitive information. Upon information and belief, Defendants failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### H. Defendants Owed Plaintiff and Class Members a Duty to Safeguard their Private Information

89. In addition to its obligations under federal and state laws, Defendants owed a duty

to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession, and their third-party vendors possession, from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that their computer systems, networks, and protocols, and those belonging to third-party vendors, adequately protected the Private Information of Class Members.

90. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their possession, including adequately training their employees and others who accessed Private Information within their computer systems on how to adequately protect Private Information

91. Defendants owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

92. Defendants owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

93. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

94. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

### I. The Data Breach Increases Plaintiff's and Class Members' Risk of Identity Theft

95. The unencrypted Private Information of Plaintiff and Class Members has been publicly posted on the dark web leak page, and will end up further disseminated and sold to criminals on the dark web, as that is the *modus operandi* of hackers.

96. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiff and Class Members.

97. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members because of the Data Breach.

98. Cyberattacks and data breaches at healthcare companies like Defendants are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

99. Researchers have found that among healthcare service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[21]

100. Researchers have further found that at healthcare service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[22]

101. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

---

[21] *See* Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour /science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[22] *See* Sung J. Choi et al., Data Breach Remediation Efforts and Their Implications for Hospital Quality, 54 HEALTH SERVICES RESEARCH 971, 971-980 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

102. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

103. As a result of Defendants failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a. The loss of the opportunity to control how their Private Information is used;

b. The diminution in value of their Private Information;

c. The compromise and continuing publication of their Private Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Private Information; and

h. The continued risk to their Private Information, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Private Information in their possession.

104. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.

105. The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals

frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

106. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

107. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

108. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

109. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

110. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the

world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

111. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

112. The Social Security Administration has similarly warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

113. Further, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very

quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[23]

114. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendants is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."

115. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[24] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[25]

116. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PHI/PII, *they will use it*.[26]

117. Approximately 21% of victims did not realize their identity has been compromised until more than two years after it happened.[27] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of

---

[23] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[24] Michael Kan, Here's How Much Your Identity Goes for on the Dark Web, (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.
[25] Dark Web Monitoring: What You Should Know, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/.
[26] *Id.*
[27] *See* Medical ID Theft Checklist, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited Oct. 25, 2025).

medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[28]

118. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[29]

119. Defendants' failure to properly notify Plaintiff and members of the Class of the Data Breach exacerbated Plaintiff's and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### J. Loss of Time to Mitigate the Risk of Identity Theft and Fraud

120. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

121. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

[28] The Potential Damages and Consequences of Medical Identify Theft and Healthcare Data Breaches ("Potential Damages"), EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Oct. 25, 2023).
[29] Guide for Assisting Identity Theft Victims, FED. TRADE COMM'N, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

122. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

123. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

124. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

125. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

---

[30] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 25, 2025).

[31] *See* Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited Oct. 25, 2025).

### K. Diminution of Value of Private Information

126. Private Information is valuable property.[32] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

127. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

128. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[33]

129. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[34]

---

[32] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Oct. 25, 2025) ("GAO Report").

[33] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hackpersonal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Oct. 25, 2025).

[34] *See*, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

130. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[35] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[36] [37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[38]

131. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

132. The fraudulent activity resulting from the Data Breach may not come to light for years.

133. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[35] *See* Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Oct. 25, 2025).
[36] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Oct.25, 2025).
[37] https://datacoup.com/ (last visited Oct. 25, 2025).
[38] https://www.thepennyhoarder.com/make-money/nielsen-panel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (last visited Oct. 25, 2025).

134. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants network, amounting to millions of individuals detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

135. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

### L. The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

136. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

137. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

138. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

139. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendants Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear, but for Defendants failure to safeguard their Private Information.

**M. Loss of the Benefit of the Bargain**

140. Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendants for the provision of their services, Plaintiff and other reasonable patients understood and expected that they were, in part, paying for the service and necessary data security to protect the Private Information when, in fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendants.

**N. Plaintiff's Experience**

141. Plaintiff is a policyholder of BCBSM, one of Defendant Conduent's Clients.

142. As a condition of obtaining services, Plaintiff was required to provide BCBSM and Conduent with his Private Information.

143. Defendants were in possession of Plaintiff's Private Information before, during, and after the Data Breach.

144. On October 24, 2025, Defendant Conduent sent Plaintiff a notice letter informing him that his Private Information was compromised as a result of the Data Breach.[39]

---

[39] *Exhibit A*, Plaintiff's Notice Letter.

145. Plaintiff reasonably understood and expected that Defendants would safeguard his Private Information and timely and adequately notify him in the event of a data breach. Plaintiff would not have allowed Defendants, or anyone in Defendants' position, to maintain his Private Information if he believed that Defendants would fail to implement reasonable and industry standard practices to safeguard that information from unauthorized access.

146. Plaintiff greatly values his privacy and Private Information and takes reasonable steps to maintain the confidentiality of her Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

147. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents he receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise his identity and credit card accounts.

148. Moreover, he diligently chooses unique usernames and passwords for his various online accounts.

149. Upon information and belief, as a result of the Data Breach, Plaintiff's Private Information was published on the dark web.

150. As a result of the Data Breach, Plaintiff has spent several hours researching the Data Breach, reviewing his bank accounts, monitoring his credit report, changing his passwords and other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

151. As a consequence of and following the Data Breach, Plaintiff has experienced a significant increase in spam calls, text messages, and emails, evidencing misuse of his Private Information.

152. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress.

153. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

154. Plaintiff has a continuing interest in ensuring that his Private Information, which upon information and belief, remains in Defendants possession, is protected and safeguarded from future breaches.

155. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to his Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendants did not adequately protect her Private Information; (d) emotional distress because identity thieves now possess his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendants obtained from Plaintiff and (g) other economic and non-economic harm.

## **CLASS ALLEGATIONS**

156. Plaintiff brings this class action, individually and on behalf of the following

Nationwide Class:

> Nationwide Class: All individuals whose Private Information was accessed and/or acquired by an unauthorized party in the Data Breach (the "Class").

157. Specifically excluded from the Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

158. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

159. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

160. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, Plaintiff estimates that the Class is comprised of millions of members, if not more. The Class is sufficiently numerous to warrant certification.

161. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Plaintiff, like the unnamed Class, had his Private Information compromised as a result of the Data Breach. Plaintiff is a member of the Class, and his claims are typical of the claims of the members of the Class. The harm suffered by Plaintiff is similar to that suffered by all other Class Members which was caused by the same misconduct by Defendants.

162. Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the

Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

163. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendants will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

164. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether Defendants data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

c. Whether Defendants storage of Plaintiff and Class Member's Private Information was done in a negligent manner;

d. Whether Defendants had a duty to protect and safeguard Plaintiff and Class Members' Private Information;

e. Whether Defendants conduct was negligent;

f. Whether Defendants conduct violated Plaintiff and Class Members' privacy;

g. Whether Defendants took sufficient steps to individuals' Private Information;

h. Whether Defendants were unjustly enriched; and

i. The nature of relief, including damages and equitable relief, to which Plaintiff

and Class Members are entitled.

165. Information concerning Defendants' policies is available from Defendants' records.

166. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation. Given that Defendants have not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

**COUNT I**

**NEGLIGENCE**

**(On behalf of Plaintiff and the Nationwide Class Against Defendants)**

167. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-166, as if fully set forth herein.

168. Defendants knowingly collected, possessed, and maintained Plaintiff and Class Members' Private Information, and therefore had a duty to exercise reasonable care in safeguarding, securing, and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

169. Defendants' duty also included a responsibility to implement processes by which they could detect and analyze a breach of their security systems quickly and to give prompt notice to those affected in the case of a cyberattack.

170. Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate security.

Defendants were on notice because, on information and belief, they knew or should have known that they would be an attractive target for cyberattacks.

171. Defendants owed a duty of care to Plaintiff and Class Members whose Private Information was entrusted to them. Defendants' duties included, but were not limited to, the following:

a. To exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting Private Information in their possession;

b. To protect the Private Information in their possession by using reasonable and adequate security procedures and systems compliant with industry standards;

c. To have procedures in place to prevent the loss or unauthorized dissemination of Private Information in its possession;

d. To employ reasonable security measures and otherwise protect the Private Information of Plaintiff and Class Members pursuant to HIPAA and the FTCA;

e. To implement processes to quickly detect a data breach and to timely act on warnings about data breaches; and

f. To promptly notify Plaintiff and Class Members of the Data Breach, and to precisely disclose the type(s) of information compromised.

172. Defendants' duty to employ reasonable data security measures arose, in part, under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

173. Defendants' duty also arose because Defendants were bound by industry standards to protect the confidential Private Information entrusted to them.

174. Plaintiff and Class Members were foreseeable victims of any inadequate security practices on the part of Defendants, and Defendants owed them a duty of care to not subject them to an unreasonable risk of harm.

175. Defendants, through their actions and/or omissions, unlawfully breached their duty to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff and Class Members' Private Information within Defendants' possession.

176. Defendants, by their actions and/or omissions, breached their duty of care by failing to provide, or acting with reckless disregard for, fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

177. Defendants, by their actions and/or omissions, breached their of care by failing to promptly identify the Data Breach and then failing to provide prompt notice of the Data Breach to the persons whose Private Information was compromised.

178. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of their networks and systems, and those of third-party vendors;

c. Failing to periodically ensure that their email system maintained reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to comply with the FTCA and HIPAA;

f. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

g. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

179. Defendants acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

180. Defendants had a special relationship with Plaintiff and Class Members. Plaintiff and Class Members' willingness to entrust Defendants with their Private Information was predicated on the understanding that Defendants would take adequate security precautions. Moreover, only Defendants had the ability to protect their systems (and the Private Information that it stored on them) from attack.

181. Defendants breach of duties owed to Plaintiff and Class Members caused Plaintiff and Class Members' Private Information to be compromised and exfiltrated, as alleged herein.

182. As a result of Defendant' ongoing failure to notify Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

183. Defendants' breaches of duty also caused a substantial, imminent risk to Plaintiff and Class Members of identity theft, loss of control over their Private Information, and loss of time and money to monitor their accounts for fraud.

184. As a result of Defendants negligence in breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

185. Defendants also had independent duties under state laws that required them to reasonably safeguard Plaintiff and Class Members' Private Information and promptly notify them about the Data Breach.

186. As a direct and proximate result of Defendants negligent conduct, Plaintiff and Class Members have suffered damages as alleged herein and are at imminent risk of further harm.

187. The injury and harm that Plaintiff and Class Members suffered was reasonably foreseeable.

188. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

189. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT II**

**NEGLIGENCE *PER SE***

**(On behalf of Plaintiff and the Nationwide Class Against Defendants)**

190. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-166, as if fully set forth herein.

191. Pursuant to Section 5 of the FTCA, Defendants had a duty to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiff and Class Members.

192. Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, Defendants had a duty to implement reasonable safeguards to protect Plaintiff and Class Members' Private Information.

193. Specifically, pursuant to HIPAA, Defendants had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of

assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

194. Defendants breached their duties to Plaintiff and Class Members under the FTCA and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class Members' Private Information.

195. Specifically, Defendants breached their duties by failing to employ industry-standard cybersecurity measures in order to comply with the FTCA, including but not limited to proper segregation, access controls, password protection, encryption, intrusion detection, secure destruction of unnecessary data, and penetration testing.

196. The FTCA prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice of failing to use reasonable measures to protect PII and PHI (such as the Private Information compromised in the Data Breach). The FTC rulings and publications described above, together with the industry-standard cybersecurity measures set forth herein, form part of the basis of Defendants duty in this regard.

197. Defendants also violated the FTCA and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiff and the Class and by not complying with applicable industry standards, as described herein.

198. It was reasonably foreseeable, particularly given the growing number of data breaches of Private Information, that the failure to reasonably protect and secure Plaintiff and Class Members' Private Information in compliance with applicable laws would result in an unauthorized third-party gaining access to Defendants networks, databases, and computers that stored Plaintiff's and Class Members' unencrypted Private Information.

199. Plaintiff and Class Members are within the class of persons that the FTCA and HIPAA are intended to protect and Defendants failure to comply with both constitutes negligence *per se*.

200. Plaintiff and Class Members' Private Information constitute personal property that was stolen due to Defendants negligence, resulting in harm, injury, and damages to Plaintiff and Class Members.

201. As a direct and proximate result of Defendants negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from the unauthorized access of their Private Information, including but not limited to damages from the lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives.

202. As a direct and proximate result of Defendants' negligent conduct, Plaintiff and Class Members have suffered injury and are entitled to compensatory and consequential damages in an amount to be proven at trial.

203. In addition to monetary relief, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to, *inter alia*, strengthen their data security systems and monitoring procedures, conduct periodic audits of those systems, and provide lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members.

**COUNT III**

**Breach Of Third Party Beneficiary Contract**

**(On Behalf of Plaintiff and the Class Against Defendant Conduent)**

204. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-166, as if fully set forth herein.

205. Defendant Conduent entered into contracts, written or implied, with its Clients, including Defendant BCBSM, to perform services. Upon information and belief, these contracts are virtually identical between and among Defendant Conduent and their Clients around the country whose clients, including Plaintiff and Class Members, were affected by the Data Breach.

206. In exchange, Defendant Conduent agreed, in part, to implement adequate security measures to safeguard the Private Information of Plaintiff and the Class.

207. These contracts were made expressly for the benefit of Plaintiff and the Class, as Plaintiff and Class Members were the intended third-party beneficiaries of the contracts entered into between Defendant Conduent and its Clients. Defendant Conduent knew that if it was to breach these contracts with its Clients, its Clients' clients —Plaintiff and Class Members—would be harmed.

208. Defendant Conduent breached the contracts it entered into with its Clients by, among other things, failing to (i) use reasonable data security measures, (ii) implement adequate protocols and employee training sufficient to protect Plaintiff Private Information from unauthorized disclosure to third parties, and (iii) promptly and adequately detecting the Data Breach and notifying Plaintiff and Class Members thereof.

209. Plaintiff and the Class were harmed by Defendant Conduent's breach of its contracts with its Clients, as such breach is alleged herein, and are entitled to the losses and damages they have sustained as a direct and proximate result thereof.

210. Plaintiff and Class Members are also entitled to their costs and attorney's fees incurred in this action.

**COUNT IV**

**UNJUST ENRICHMENT**

**(On behalf of Plaintiff and the Nationwide Class Against Defendants)**

211. Plaintiff restates and realleges all of the allegations stated in paragraphs 1-166, as if fully set forth herein.

212. Plaintiff and Class Members conferred a benefit on Defendants by providing their Private Information to Defendants. Moreover, upon information and belief, Plaintiff and Class Members allege that payments made to Defendants included payments for cybersecurity protection to protect Plaintiff and Class Members' Private Information, and that those cybersecurity costs were passed on to Plaintiff and Class Members in the form of elevated prices charged by Defendants for their services. Plaintiff and Class Members did not receive such protection.

213. Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including from payments made to Defendants by Plaintiff and Class Members.

214. As such, a portion of the payments made by Plaintiff and Class Members is to be used to provide a reasonable and adequate level of data security that is in compliance with applicable state and federal regulations and industry standards, and the amount of the portion of each payment made that is allocated to data security is known to Defendants.

215. Defendant has retained the benefits of its unlawful conduct, including the amounts of payment received indirectly from Plaintiff and Class Members that should have been used for adequate cybersecurity practices that it failed to provide.

216. Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from these transactions and used the Private

Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for adequate data security measures that would have secured Plaintiff and Class Members' Private Information and prevented the Data Breach.

217. If Plaintiff and Class Members had known that Defendants had not adequately secured their Private Information, they would not have agreed to provide such Private Information to Defendant.

218. Due to Defendants conduct alleged herein, tit would be unjust and inequitable under the circumstances for Defendants to be permitted to retain the benefit of its wrongful conduct.

219. As a direct and proximate result of Defendants conduct, Plaintiff and Class Members have suffered, and/or are at a continued, imminent risk of suffering, injury that includes but is not limited to the following: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and/or theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in Defendants possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect Private Information in its continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

220. Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

221. Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is the proper representative of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding him appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

f. A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: November 6, 2025

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

*/s/ Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad St., Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

**MILBERG, PLLC**
Mark K. Svensson
405 East 50th Street
New York, New York 10022
Tel.: (202) 975-0468
msvensson@milberg.com

*Attorneys for Plaintiff and the Proposed Class*

**LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the below matters:

- *Comer v. Conduent Inc.*, Civil Action No. 2:25-cv-17188 (D.N.J.), filed Nov. 4, 2025;
- *Burwell v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17170 (D.N.J.), filed Nov. 4, 2025;
- *Bianco v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17177 (D.N.J.), filed Nov. 4, 2025;
- *Fray v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17137 (D.N.J.), filed Nov. 3, 2025;
- *Meschke v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17108 (D.N.J.), filed Oct. 31, 2025;
- *Meschke v. Conduent Bus. Servs., LLC*, Civil Action No. 3:25-cv-17108 (D.N.J.), filed Oct. 31, 2025;
- *Medrano v. Conduent Inc.*, Civil Action No. 2:25-cv-17082 (D.N.J.), filed Oct. 31, 2025;
- *Willstein v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17068 (D.N.J.), filed Oct. 30, 2025;
- *Knick v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17033 (D.N.J.), filed Oct. 29, 2025;
- *Smith v. Conduent Inc.*, Civil Action No. 2:25-cv-16965 (D.N.J.), filed Oct. 28, 2025;
- *Marshall v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-16994 (D.N.J.), filed Oct. 28, 2025;
- *Bordelon v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-16975 (D.N.J.), filed Oct. 28, 2025;
- *Amende v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-16954 (D.N.J.), filed Oct. 27, 2025;
- *Berkenfeld v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-17197 (D.N.J.), filed Nov. 4, 2025;

- *Adams-Griffin v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-16953 (D.N.J.), filed Oct. 27, 2025; and
- *Bordelon v. Conduent Bus. Servs., LLC*, Civil Action No. 2:25-cv-16666 (D.N.J.), filed Oct. 15, 2025.

Dated: November 6, 2025

**LITE DEPALMA GREENBERG & AFANADOR, LLC**

/s/ *Joseph J. DePalma*
Joseph J. DePalma
Catherine B. Derenze
570 Broad St., Suite 1201
Newark, New Jersey 07102
Tel: (973) 623-3000
jdepalma@litedepalma.com
cderenze@litedepalma.com

**MILBERG, PLLC**
Mark K. Svensson
405 East 50th Street
New York, New York 10022
Tel.: (202) 975-0468
msvensson@milberg.com

*Attorneys for Plaintiff and the Proposed Class*

# EXHIBIT A

CONDUENT
Return to Kroll
P.O. Box 980108
West Sacramento, CA 95798

114[redacted]

ERIC LARSON
[redacted]

[redacted]

SCAN TO ENROLL

October 24, 2025

Re: Notice of Data Incident

Dear Eric Larson:

On behalf of our clients, Conduent Business Services, LLC ("Conduent") provides third-party printing/mailroom services, document processing services, payment integrity services, and other back-office support services. We are writing to inform you about a recent incident experienced by Conduent that may have involved some of your personal information, which came into our possession due to the services that we provide to Blue Cross and Blue Shield of Montana. While we are unaware of any attempted or actual misuse of any information involved in this incident, we are providing you with information about the incident and steps you can take to protect yourself, should you feel it necessary.

**What Happened?** On January 13, 2025, we discovered that we were the victim of a cyber incident that impacted a limited portion of our network. We immediately secured our networks and initiated an investigation with the assistance of third-party forensic experts. Our investigation determined that an unauthorized third party had access to our environment from October 21, 2024, to January 13, 2025, and obtained some files associated with Blue Cross and Blue Shield of Montana. Given the nature and complexity of the data involved, Conduent has been working diligently with a dedicated review team, including internal and external experts, to conduct a detailed analysis of the affected files to identify the personal information contained therein. We are providing you with this notice upon the recent conclusion of this time-intensive data analysis as your personal information was contained in the affected files.

**What Information Was Involved.** The affected files contained your name and the following: address, date of birth, and Social Security number. Presently, we have no evidence or indication of actual or attempted misuse of your personal information.

**What We Are Doing.** Upon discovery of the incident, we safely restored our systems and operations and notified law enforcement. We are also notifying you in case you decide to take further steps to protect your information should you feel it appropriate to do so. In addition, we are providing you with access to 12 months of credit monitoring and identity restoration services through Kroll at no charge to you. You must enroll by March 31, 2026.

**What You Can Do.** Please review the enclosed "*Steps You Can Take to Help Protect Your Information*" which describes the services we are offering, how to activate them, and provides further details on how to protect yourself. We encourage you to remain vigilant against the potential for identity theft and fraud and to monitor your credit reports for any suspicious activity.

**For More Information.** We sincerely regret any issue this incident may have caused you. If you have additional questions, you may call our dedicated assistance line (866) 559-4749 (toll-free), Monday–Friday, from 9:00 a.m. to 6:30 p.m. Eastern Time, or write to us at Attn: Data Incident, 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

Sincerely,

Conduent Business Services, LLC

# STEPS YOU CAN TAKE TO HELP PROTECT YOUR INFORMATION

## Enroll in Complimentary Identity Monitoring Services

We are providing you with 12 months of identity monitoring services through Kroll. A credit card is not required for enrollment. To enroll, at no cost to you,

- **Visit** https://Enroll.krollmonitoring.com/redeem
- **Enter** your Activation Code: **QKAG-K6SD-EUHU-RP25** and your verification ID: **SF-013093**
- Ensure that you **enroll by: March 31, 2026** (Your code will not work after this date.)

With identity monitoring services from Kroll, you have access to the following features once you enroll:

- **Credit Monitoring with Alerts:** Actively monitors your credit and provides alerts when there are changes to your credit data.
- **Fraud Consultation:** Unlimited access to consultation with Kroll fraud specialists who can advise on the most effective ways to protect your identity.
- **Identity Restoration:** Identity Restoration specialists are immediately available to help you address identity theft issues.

If you have questions about the product or need assistance with identity restoration, please contact the customer care team at (866) 559-4749 by the enrollment date listed above. Be prepared to provide your activation code and verification ID as proof of eligibility for the identity monitoring services.

## Obtain a Free Credit Report

Under U.S. law, you are entitled to one free credit report annually from each of the three major credit reporting bureaus (Equifax, Experian, and TransUnion). Obtaining a copy of your credit report from each agency on an annual basis, and reviewing it for suspicious activity, can help you spot problems and address them quickly. You can request your free credit report online at www.annualcreditreport.com or by phone at 1-877-322-8228. You can also request your free credit report by completing the request form at: www.annualcreditreport.com, and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348-5281. You may wish to stagger your requests so that you receive a free report by one of the three credit bureaus every four months.

## Place a Fraud Alert

As a precaution against identity theft, you can consider placing a fraud alert on your credit file. A "fraud alert" tells creditors to contact you before opening a new account or changing an existing account. A fraud alert also lets your creditors know to watch for unusual or suspicious activity. To place a fraud alert, call any one of the three major credit reporting agencies listed below. An initial fraud alert remains effective for ninety days and is free of charge. If you wish, you can renew the fraud alert at the expiration of this initial period. As soon as one credit agency confirms your fraud alert, the others are notified to place fraud alerts on your file.

**Equifax®**
P.O. Box 105069
Atlanta, GA 30348-5069
1-800-685-1111
https://www.equifax.com/personal/credit-report-services/credit-fraud-alerts

**Experian**
P.O. Box 9554
Allen, TX 75013-9701
1-888-397-3742
www.experian.com/fraud/center.html

**TransUnion®**
P.O. Box 2000
Chester, PA 19016-1000
1-800-680-7289
https://www.transunion.com/fraud-alerts

## Place a Security Freeze

Federal law also allows consumers to place, lift or remove a security freeze on their credit reports at no charge. A security freeze prohibits a credit reporting agency from releasing any information from a consumer's credit report without written authorization. Be aware that placing a security freeze on your credit report may delay, interfere with, or prevent the timely approval of any requests you make for new loans, credit, mortgages, employment, housing, or other services.

To place a security freeze on your credit report, you must send a written request by regular, certified, or overnight mail to the addresses below to *each* of the three major credit reporting agencies: Equifax (www.equifax.com); Experian (www.experian.com); and TransUnion (www.transunion.com). You may also request the security freeze through *each* of the credit reporting agencies' websites or over the phone:

| **Equifax®** | **Experian** | **TransUnion®** |
|---|---|---|
| P.O. Box 105788 | P.O. Box 9554 | P.O. Box 160 |
| Atlanta, GA 30348-5788 | Allen, TX 75013 | Woodlyn, PA 19094 |
| 1-888-298-0045 | 1-888-397-3742 | 1-888-909-8872 |
| https://www.equifax.com/personal/help/place-lift-remove-security-freeze/ | www.experian.com/freeze/center.html | www.transunion.com/credit-freeze |

In order to request a security freeze, you will need to provide the following information:

1. Your full name (including middle initial as well as Jr., Sr., II, III, etc.);
2. Social Security Number;
3. Date of birth;
4. If you have moved in the past five (5) years, provide the addresses where you have lived over the prior five years;
5. Proof of current address such as a current utility bill or telephone bill;
6. A legible photocopy of a government issued identification card (state driver's license or ID card, military identification, etc.); and
7. If you are a victim of identity theft, include a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft.

The credit reporting agencies have three (3) business days after receiving your request to place a security freeze on your credit report. The credit bureaus must also send written confirmation to you within five (5) business days and provide you with a unique personal identification number (PIN) or password, or both that can be used by you to authorize the removal or lifting of the security freeze.

To lift the security freeze in order to allow a specific entity or individual access to your credit report, you must call or send a written request to the credit reporting agencies by mail and include proper identification (name, address, and social security number) and the PIN number or password provided to you when you placed the security freeze as well as the identities of those entities or individuals you would like to receive your credit report or the specific period of time you want the credit report available. The credit reporting agencies have three (3) business days after receiving your request to lift the security freeze for those identified entities or for the specified period of time.

To remove the security freeze, you must send a written request to each of the three credit bureaus by mail and include proper identification (name, address, and social security number) and the PIN number or password provided to you when you placed the security freeze. The credit bureaus have three (3) business days after receiving your request to remove the security freeze.

**Additional Information**

You may obtain additional information about identity theft (including, a security freeze) by contacting the above credit reporting agencies, the Federal Trade Commission (FTC), or your state Attorney General. The Federal Trade Commission can be reached at: 600 Pennsylvania Avenue NW, Washington, DC 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. For New York residents, the Attorney General can be contacted at The Capitol, Albany, NY, 12224, ag.ny.gov, or 800-771-7755. For North Carolina residents, the Attorney General can be contacted at 9001 Mail Service Center, Raleigh, NC 27699, ncdoj.gov, or 919-716-6000. You are advised to report known or suspected identity theft to law enforcement, including your state's Attorney General and the FTC. Under the law, you have the right to obtain any police report filed in regard to this incident. If you are the victim of identity theft or fraud, you also have the right to file a police report and obtain a copy of it. Notice was not delayed as a result of law enforcement.